# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **V.** | ) | **Criminal No. 16-10328-IT** |
| | ) | |
| **DIAMOND BRITO** | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

On November 10, 2014, counsel in this case consummated a plea agreement that had been the subject of careful negotiation and provided the defendant with certainty regarding the sentence that will be imposed.   If accepted by this Court, the defendant will remain under criminal justice system supervision for three additional years after completing his 5-year state court probation revocation sentence (which revocation was based on the same conduct at issue here and is to be served concurrently with the sentence here) and then will be on supervised release for four additional years.

The government therefore urges the Court to accept the agreed-upon disposition in the parties' plea agreement and sentence the defendant to 96 months concurrent to the 5-year revocation sentence imposed in Commonwealth v. Brito, Norfolk Superior Court No. 1282CR00140 plus 4 years of supervised release.[1]

The proposed sentence is four months below the low end of 100-125 month sentence correctly calculated by United States Probation in the Presentence Report ("PSR").   See PSR at 87.   The agreed-upon sentence reflects both the seriousness and the repetitive nature of the

---

1 It should be noted that the parties entered into the plea agreement here (agreeing to a 96 month to be served concurrently with the state court revocation sentence) before that sentence was imposed.

1

defendant's crimes, which in total amounted to the defendant selling 12 firearms and a total of 37.18 grams of crack cocaine in 13 separate sales between October 30, 2015 and February 24, 2016. PSR at ¶¶8-31. In this district, the trafficking of firearms should be viewed as an extremely serious offense that justifies the requested 96-month sentence. See United States v. Diaz-Arroyo, 797 F.32d 725, 729 (1st Cir. 2015) (affirming sentence in gun case based on sentencing judge's observations regarding, inter alia, the high rate of violent crime in the District of Puerto Rico and the plethora of young men on that island carrying dangerous weapons); United States v. Politano, 522 F.3d 69, 72 (1st Cir. 2008) (same for the District of Massachusetts).

Of course, the seriousness of the offense is but one of the numerous factors to considered at sentencing. See United States v. King, 741 F.3d 305, 308 (1st Cir. 2014("Sentencing requires a broader focus because 'section 3553(a) is more than a laundry list of discrete sentencing factors; it is, rather, a tapestry of factors, through which runs the thread of an overarching principle that a sentencing court ought to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." Id. (quoting 18 U.S.C. § 3553(a)").   Recognizing this principle, the parties attempted to balance the seriousness of the offenses with certain markers for potential future success such as the fact that the defendant has obtained his GED and had worked to develop job skills at Roca, Inc., a well-known youth service organization.   PSR at ¶ ¶ 82-83.   It is also hoped that drug treatment will help the defendant to make better choices in the future (see PSR at ¶ ¶ 80-81).   The defendant should also recognize that, when he is released from his sentence here, he will qualify as a career offender and would be looking at an advisory guideline range of 151-188 months or more should he resume trafficking drugs and a seven-year mandatory minimum state court sentence were he to pick up another gun.   It is hoped that these

realities will be sufficient to deter Mr. Brito from future crime that could place him in jail for much of his adult life.

For these reasons, the government urges the Court to accept the Rule 11(c)(1)(C) plea and sentence the defendant to 96 months in prison with that sentence to be served concurrently with the state court revocation sentence described at paragraph 53 of the PSR.[2]

## PROPOSED JUDICIAL RECOMMENDATIONS

Any plan designed to give the defendant the maximum chance at positive life change must of course begin with the terms and conditions of his incarceration. E.g., United States v. Gautier, 590 F. Supp. 2d 214 (D. Mass. 2008) ("I have required Probation to devise a recommended plan for him, both as a recommendation for the Bureau of Prisons during the period of his incarceration and as a template for his supervised release afterwards. Studies suggest the significance on recidivism of a consistent plan, beginning in prison and extending into reentry. Laurie Robinson & Jeremy Travis, 12 Fed. S.R. 258 (2000)").   The government is requesting that the Court make the following recommendations to the Bureau of Prisons: (i) that the defendant be given any available substance abuse treatment (including, without limitation the 500-hour drug treatment program); and, (ii) that the defendant be given any available vocational training (so that the defendant may have maximum marketable job skills when he is released).

## SUPERVISED RELEASE CONDITIONS

The government also requests that the following Special Conditions be incorporated into

---

2  Nothing set forth in this memorandum should be construed as a request for any sentence in excess of 96 months.   As set forth herein, the government urges the court to accept the agreed upon disposition of 96 months and asks that it be served concurrently with his current state curt revocation.

the Judgement of Conviction:

**A.   Drug testing**.   The defendant should be required to submit to a drug test within 14 days after his release from custody and to such additional drug tests (not to exceed 104 per year) as Probation believes may be required during the entire period of supervised release.

**B.   Drug and Mental Health evaluation/counseling**.   The defendant should participate in any drug or mental health treatment required by during the period of Supervised Release if probation feels that such treatment is warranted.   See PSR at ¶78 (utility of mental health evaluation) and ¶¶ 80-81 longstanding substance abuse since age 12).

**C. Residence.** Based on the PSR, it is not clear where Mr. Brito will reside upon his release.   See PSR at ¶ 74 (no home visit performed).   Therefore, the government recommends that the defendant be required to spend the first 6 months of his supervised release in a Residential Re-entry Center ("RRC") *if* he doesn't have a residence approved by Probation.   The defendant should stay in RRC only until he gets an approved residence but should comply with the rules of the facility while living there.

**D. Curfew.**   The government also recommends that, for the first 9 months that the defendant is on the street (i.e., after he is released from any RRC), a curfew of 10pm-6am should be imposed and enforced by electronic monitoring. See, e.g., "Maximum Impact: Targeting Supervision on Higher Risk People, Places and Times," Pew Center for the States Public Policy Brief (March, 2009) (concluding that Probationers are "at the highest risk of re-arrest during the first few months on community supervision," that arrest rates after 15 months were substantially lower, and thus recommending that probation resources be "front end loaded" to achieve maximum effect).   Probation should also be given the authority to adjust the curfew for work or

school.

**E. MRT.** The defendant should attend the MRT program (or any other cognitive behavioral program) if directed to do so by Probation.

**F. CARE/RESTART.** The government requests that the Court make a recommendation for either CARE or RESTART Programs.

**G. GEOGRAPHIC/ASSOCIATIONAL RESTRICTIONS**.   As set forth in the PSR, the Boston Police Department has identified Mr. Brito as being associated with the Orchard Park Trailblazers, a gang that operates in and around the Orchard Park Housing Development in Roxbury's Dudley Square. PSR at ¶ 8.   Many of his criminal contacts (and all of the buys in this case) also took place in and around Dudley Square where the Orchard Park Development is located. The government therefore asks that the Court order the defendant to stay out of the area of the Orchard Park Housing Development (as delineated on Exhibit 1) and order him not to associate with the individuals identified on Exhibit 2 (individuals who he has offended with or other members of the Orchard Park Trailblazers who he has associated with) while he is on Supervised Release unless he has the express permission of Probation to do so.   The government seeks these restrictions both to safeguard public safety <u>and</u> protect Mr. Brito from himself by keeping him away from areas where the presence of drugs and former associates might cause him to make bad decisions that could cause him to spend even longer terms in prison.

The rationale for such restrictions has been explained as follows:

> Recidivism is due to offenders' retaining criminogenic motivation or propensity and their having access to opportunities for crime.   Thus, to reduce re-offending, an important task for a probation or parole agency is to provide or place offenders into treatment programs, based on the principles of effective rehabilitation, that diminish their propensity for crime.   *The other task, however, is for probation and parole officers to reduce offenders' access to crime opportunities.*

5

Cullen et al, "Environmental Corrections−A New Paradigm for Effective Probation and Parole

Supervision" 66 Federal Probation 28 (2002) (hereinafter referred to as "Cullen")(emphasis

supplied).   Because both the literature and common sense show that opportunities for crime will

be presented whenever a defendant returns to the area in which his offending began and grew

(and in which his street credentials and sense of self may have been based on that very

criminality), removing him from that area can reduce both the opportunities for further crime and

the expectation from those around him that he will re-offend.   Thus, "[t]he effectiveness of

probation and parole supervision will be increased to the extent that officers systematically. . .

reduce the extent to which offenders are tempted by and come into contact with opportunities for

crime."   Id. at 31. See also La Vigne et al., "Prisoner Reentry and Community Policing:

Strategies for Enhancing Public Safety," Washington D.C.: Urban Institute Justice Policy Center,

Mar. 2006, at 25 ("most potential offenders are not highly motivated to commit crime but do so

when they are presented with opportunities to offend easily."); Dickey et al, "Promoting Public

Safety: A Problem-Oriented Approach To Prisoner Reentry in Prisoner Reentry and Community

Policing: Strategies for Enhancing Public Safety," Washington D.C.: Urban Institute Justice

Policy Center, May 2004, at 61-62 ("when offenders first reenter communities, they themselves

are vulnerable, for all of the reasons that have been suggested in literature on reentry: mental

health problems, lack of family connections, drug and alcohol addictions, lack of education and

employment. . .Fixing these problems is often implausible. . . .Instead, we can alter environments

[and] remove temptations. . . ").

        As commonsensical as these notions are, effective implementation is equally

straightforward.   Rather than the rely exclusively on the sweeping provisions set forth in

U.S.S.G. §5D1.3 (c) (8-9) (which, among other things now require the Defendant to know that the individual with whom he is associating has a felony conviction), the literature suggests that narrower restrictions are more effective--restrictions precluding the Defendant from being with particular, identified people or specifically delineated areas that the record shows have previously led him into crime. Cullen at 33 (recommending that probation officers attempt "to disrupt routine activities that increase crime opportunities" that are based on the Defendant's past offending by, among other things, prohibiting contact with specific people (e.g., past co-offenders) and "prohibiting traveling on specific streets" (e.g., areas of past criminality outlined on a map given to the offender). That is exactly what the government seeks to do here.[5]

Of course, the government cannot advocate such restrictions without establishing their appropriateness.   Appellate courts have routinely upheld such restrictions as a condition of probation or supervised release whenever, as here, the restriction served as a deterrent to protect the victimized community and/or rehabilitate the Defendant based on his prior offending.   See United States v. Garrasteguy, 559 F.3d 34 (1st Cir. 2009) (affirming on plain error review 12-year restriction from Suffolk County imposed on Defendant who sold drugs at Bromley Heath Housing Development);   United States v. Watson, 582 F.3d 974 (9th Cir. 2009)(validating restriction that prevented Defendant from entering city and county of San Francisco without the prior approval of his Probation Officer); United States v. Cothran, 855 F.2d 749 (11th Cir. 1988)

---

[5]   In a presentation made to the Boston Bar Association, the Probation Department publicly stated that "associates and attitudes" are the two most important indicators or recidivism. While a Defendant's attitude can be harder to change in the short term, (but can be helped by training like the Moral Reconation Therapy Program offered by Probation), access to criminal associates can be restricted by exactly the type of associational and geographic restrictions sought here and frequently imposed in other similar cases.

(validating a probation restriction that prevented Defendant, convicted of cocaine distribution to minors, from traveling to Fulton County, Georgia, because his return to a high-crime neighborhood in southeast Atlanta would likely result in his continued criminal activity and the endangerment of neighborhood youth); United States v. Sicher, 239 F.3d 289, 292 (3d Cir. 2000) (upholding a supervised release restriction, after various drug convictions, that covered two counties in the Allentown, Pennsylvania, area because the "territorial limitation [was] clearly intended to promote [Defendant's] rehabilitation by keeping [Defendant] away from the influences that would most likely cause her to engage in further criminal activity").[3]  See also United States v. Alexander, 509 F.3d 253, 256-57 (6th Cir. 2007) (affirming condition of supervised release that required Defendant to live in city several hundred miles away from family for first 12 months of supervised release; court noted that condition: (a) "will further [Defendant's] rehabilitation efforts by temporarily removing him from the destructive influences that have plagued him;" and (b) "holds the potential to protect the community from future crimes

---

[3]In approving the much broader geographic restriction imposed in Garrasteguy, the First Circuit described the legal framework for such conditions as follows:

> District courts have significant flexibility to impose special conditions of supervised release.  A district court may impose as a condition of supervised release most discretionary conditions identified in 18 U.S.C. § 3563(b), or any other condition the court deems appropriate. All such conditions, however, must be "reasonably related" to the factors set forth in § 3553(a), may involve "no greater deprivation of liberty than reasonably necessary" to achieve the purposes of §§ 3553(a)(2)(c), (a)(2)(D), (viz. to protect the public and promote the rehabilitation of the Defendant), and must be consistent with any pertinent policy statement of the United States Sentencing Commission. 18 U.S.C. § 3583(d); see also United States v. York, 357 F.3d 14, 20 (1st Cir.2004).

559 F.3d at 41 (footnotes omitted).   A court should also explain the reason for imposing the conditions and, in doing so, discuss how they relate to the statutory sentencing factors contained in 18 U.S.C. §3553.   See United States v. Thompson, 777 F.3d 368, 373-74 (7th Cir. 2015).

as well"); 18 U.S.C. § 3563(b)(6) (authorizing conditions that a Defendant refrain from associating unnecessarily with specified persons) & 13 (authorizing conditions that a Defendant refrain from residing in a particular area).

The requested restrictions should also be imposed here because the need for them is fully supported by the record.   The restrictions are based on Mr. Brito's prior criminal contacts as shown on historic Boston Police Department Reports or FIOs (all of which were disclosed to the Defendant at the outset of the case).   All of the persons on the Associational list are individuals who BPD records show Mr. Brito was associating with, usually in the very same area.   Almost all have either felony convictions or are listed on the BPD Gang Database and are therefore persons with whom the defendant should not be associating upon his release.

In seeking these restrictions, the government is also sensitive to preserving established family relationships whenever possible.   Here, the government has drafted the restriction so that Mr. Brito can return to his mother's house or the residence of one or more of his siblings if that it feasible.   The restrictions are also drafted to give Probation the flexibility to modify the restrictions for good cause shown (such as work or school).   And of course the Defendant will always have the right to ask the Court to modify them while he is on Supervised Release.

Respectfully submitted,

CARMEN M. ORTIZ
UNITED STATES ATTORNEY

By: /s/ John A. Wortmann, Jr.
JOHN A. WORTMANN, JR.
Assistant U.S. Attorney
One Courthouse Way
Boston, MA 02210
617-748-3100

9

## <u>CERTIFICATE OF SERVICE</u>

   The government hereby certifies that the foregoing was this day filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated as non-registered participants.

            <u>/s/ John A. Wortmann, Jr. 1-31-17</u>
            JOHN A. WORTMANN, JR.
            Assistant U.S. Attorney

10